## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**GARRY LEWIS, ET AL.**

|   |   |
|---|---|
| | **CIVIL ACTION** |
| **VERSUS** | |
| | **NO. 17-1644-JWD-SDJ** |
| **UNITED STATES OF AMERICA, ET AL.** | |

## RULING AND ORDER

I. **INTRODUCTION**

This matter comes before the Court on *Plaintiffs' Motion for Partial Summary Judgment and Fees* (Doc. 171) ("*Pls. Motion*"). Plaintiffs Garry Lewis, Brenda Gayle Lewis, G. Lewis Louisiana, LLC, Robert Beard, Carolyn Milton, and Town of Livingston, LA (collectively, "Plaintiffs"),[1] move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that (a) there is no material factual dispute as to the waters at issue and (b) the governing law is now clear. (Doc. 171-1 at 4–5.) Plaintiffs assert that Defendant United States Army Corps of Engineers ("Corps") has failed to show Clean Water Act jurisdiction over the property in dispute under the governing law as clarified in *Sackett v. EPA*, 598 U.S. 651 (2023). (Doc. 171-1 at 8, 10.) Plaintiffs further argue that summary judgment rather than remand is

---

[1] As the Court has noted before, the pleadings and memoranda frequently do not distinguish among the various Plaintiffs or to whom "Plaintiffs" or "Plaintiff" refers. The same holds true with references to "Defendants" and "Defendant."

Defendants argues in a footnote, (Doc. 177 at 2 n.2), that only those Plaintiffs with an ownership interest in the Milton Lane Property may properly bring this Administrative Procedure Act cause of action. Defendants claim that Plaintiffs Beard, Milton, and Town of Livingston have no ownership interests in Milton Lane nor injuries stemming from the 2021 Approved Jurisdictional Determination, merely "speculative claims for damages under the Federal Tort Claims Act based on injuries allegedly suffered in 2016–17 as a result of delays in processing requests by Mr. Lewis." (*Id.*) The Court found that "Defendants are liable to these Plaintiffs for their negligence and the breach of the duty of care owed to them under Louisiana law" with respect to Plaintiffs' claims under the Federal Tort Claims Act. (Doc. 175 at 5.) The question of whether Plaintiffs Beard, Milton, and Town of Livingston are proper plaintiffs with respect to the pending motion for summary judgment was not fully briefed by the parties, nor does it have a direct impact on the Court's ruling in this matter.

appropriate on this point since, they claim, the Corps cannot show Clean Water Act jurisdiction under the facts in evidence. (Doc. 180 at 4–5, 9.)

Defendants United States of America ("USA"), United States Army Corps of Engineers ("Corps"), and Colonel Cullen Jones ("Jones") (collectively, "Defendants") have filed *Defendants' Response in Opposition to Plaintiffs' Partial Motion for Summary Judgment and Motion for Fees* (Doc. 177) ("*Defs. Opp.*"). Defendants argue that there is a "possibility" that the Corps could find Clean Water Act jurisdiction following a remand to the agency for further consideration. (Doc. 177 at 11.) As such, it argues that there remains "uncertainty as to what the outcome would be on remand" and that summary judgment would therefore be improper. (*Id.* at 12.) Defendants further argue that under the Administrative Procedure Act ("APA"), the Court's review is limited to "'deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" (*Id.* at 6) (quoting *Permian Basin Petroleum Ass'n v. Dept. of the Interior*, 127 F. Supp. 3d 700, 706 (W.D. Tex. 2015)).

For the reasons stated below, the Court finds that the Corps' actions are not in accordance with law as clarified in *Sackett* and are therefore not consistent with the APA standard of review. Furthermore, Defendants have repeatedly been instructed to file the full administrative record with the Court. (Docs. 85, 99, 110.) However, only portions have thus far been submitted to the Court. (*See, e.g.*, Docs. 131-1–4, 139, 163, 177-2.) Based on the facts as contained in the portions of the administrative record currently in evidence, the Court finds that no application of *Sackett* and guiding regulations can lead to a finding of Clean Water Act jurisdiction over the property at issue. Accordingly, *Plaintiffs' Motion for Partial Summary Judgment* is granted.

## II. BACKGROUND

### A. Factual Background

2

The Court has articulated the facts of this case numerous times in the past. (Docs. 67, 175.) It has, furthermore, witnessed this case unfold over the past decade. Plaintiffs Gary Lewis and Brenda Lewis, doing business as G. Lewis Louisiana, LLC (collectively, "the Lewis Plaintiffs"), own certain real property in Livingston Parish, Louisiana, over which the Corps asserts regulatory jurisdiction under the Clean Water Act. (Doc. 143 at 3–4.) At the heart of this matter is a 19-acre property ("the Milton Lane Property"), which Plaintiffs claim "is directly adjacent, south, and 'overlapping'" 40 additional acres of the Lewis Plaintiffs' properties that has been the subject of litigation in the Eastern District and before the Fifth Circuit. (Doc. 171-1 at 8.) As the Court has previously recounted, the Lewis Plaintiffs claim that they entered into a verbal contract with the Town of Livingston to provide land, rights of way, funds, and permit requests to provide municipal drinking water via a water tower. (Doc. 175 at 6.) Crucially to this litigation, the Lewis Plaintiffs also agreed to install water lines along Milton Lane, its roadside ditches, and its adjoining property. (*Id*.) Plaintiffs allege that this would have replaced contaminated drinking water, which caused injuries to Plaintiffs Milton and Beard and property damage to Plaintiff Beard. (Doc. 143 at 19–20.)

Plaintiffs initially sought a jurisdictional determination for the Milton Lane Property roughly a decade ago, in November of 2014. (Doc. 175 at 6.) After extensive delays, Plaintiffs asked the Corps for a jurisdictional determination of Plaintiffs' additional 40 acres on July 13, 2015. (*Id.* at 7) Plaintiffs' request for a jurisdictional determination as to Milton Lane was delayed until a "preliminary" determination was issued on October 14, 2015. (Doc. 143 at 5.) On October 29, 2015, Plaintiffs submitted a permit application to install municipal water lines on the Milton Lane Property. (*Id.*) In late 2015, the Corps issued a Notice of Violation and a Cease and Desist preventing Plaintiffs from conducting silviculture activity on their properties. (Doc. 175 at 7–8.)

Plaintiffs challenged the assertion of Clean Water Act jurisdiction made by the Government through the Notice of Violation and Cease and Desist in its November 9, 2017, filing before the Court. (*Id.* at 7.) Likewise, Plaintiffs sought an Approved Jurisdictional Determination for Milton Lane—which the Corps, at the time, refused to issue. (Doc. 1 at 19–21.)

In August of 2016, the Corps produced an Approved Jurisdictional Determination for the 40 acres stating that those parcels contained only 22-38% wetlands—and that the Corps had jurisdiction over "all" the property. (Doc. 175 at 7.) Plaintiffs later requested a permit to use the non-wetlands portion for housing; upon the Corps' denial, Plaintiffs sued in the United States District Court for the Eastern District of Louisiana on February 21, 2018, challenging the Corps' jurisdiction over these lands. (*Id.*) The Eastern District ultimately determined that the administrative record was "insufficient to support the conclusion that wetlands on the property met the 'adjacency' test or had a 'significant nexus' to traditional navigable waters[,]" and it remanded the matter to the Corps. *Lewis v. United States*, 88 F. 4th 1073, 1077 (5th Cir. 2023) (*Lewis I*).

On remand, the Corps again found that it had Clean Water Act jurisdiction over the site; the Eastern District rejected Lewis's request for further judicial review of the revised 2020 Approved Jurisdictional Determination and entered a final judgment. *Id.* Lewis appealed to the Fifth Circuit, which consolidated the appeal with Lewis's separate proceedings stemming from his challenge to the 2020 Approved Jurisdictional Determination, pending the Supreme Court's decision in *Sackett v. EPA*. *Id.* Following *Sackett*, the Fifth Circuit determined that neither the 2017 Approved Jurisdictional Determination nor the 2020 Approved Jurisdictional Determination supported a finding of Clean Water Act jurisdiction for the 40 acres in question. *Id.* at 1078. It found that the Corps' attempts to "withdraw" the Approved Jurisdictional Determination "places finality in the agency's sole control" and "could create an 'endless loop' of financially onerous

regulatory activity by thwarting finality in this way." *Id.* at 1079. The Fifth Circuit found that remand was "not appropriate to allow [the Corps] another attempt to assert federal authority over the Lewis property. The 'ordinary remand rule' does not apply where 'there is not the slightest uncertainty as to the outcome of the agency's proceedings on remand.'" *Id.* (quoting *Calcutt v. FDIC*, 598 U.S. 623, 630 (2023)) (cleaned up). The Fifth Circuit stated "[w]here the governing law is now clear, and the relevant facts cannot be disputed, the only possible conclusion" was that there was no Clean Water Act jurisdiction. *Id.* at 1079–80. The Fifth Circuit looked to the Supreme Court's ruling in *Sackett* in declining to remand for further agency consideration. *Id.*

While this parallel litigation was ongoing, this Court ordered Defendants to process Plaintiffs' Approved Jurisdictional Determination requests and permit applications, explain the Cease and Desists, and produce an Administrative Record in August of 2020. (Doc. 67 at 26.) The Court permitted Defendants to produce the administrative record after the Corps took action on remand. (Doc. 80 at 18.) The Corps ultimately produced a 2021 Approved Jurisdictional Determination finding that Clean Water Act jurisdiction existed over Milton Lane. (Doc. 100-3.)

Defendants failed to produce the Administrative Record by the Court's deadline of August 2, 2021; the Court granted an extension until August 17, 2021, but reiterated that Defendants were required to provide a full administrative record "dating back to the inception of this process." (Docs. 85, 99.) Defendants again failed to produce the Administrative Record to the Court. Plaintiffs allege that Defendants delivered approximately 70,000 pages of discovery documents, portions of which were withheld, redacted, missing, or out of order—and did not produce an accurate privilege log. (Doc. 107-1 at 1, 2.) The Court held Defendants in contempt for their repeated delays in responding to the permitting process and again ordered Defendants to produce the Administrative Record, supplementing it "with everything that transpires during the permit

application process." (Doc. 110 at 2.) To date, the Court does not have the full Administrative Record. However, Plaintiffs have submitted the privilege log given to them by Defendants, which is 297 pages long. (Doc. 107-2.) Plaintiffs have further submitted documents from the 70,000 pages of discovery they received from Defendants, including numerous documents fully redacted or blacked out. (Doc. 107-5.)

Defendants complied with the Court's order to provide an administrative record insofar as they filed approximately 100 pages of documents as attachments to the *United States' Opposition to Motion for Order of Contempt*. (Docs. 100-1–12.) These attachments include the Preliminary Jurisdictional Determination, Approved Jurisdictional Determination, Plaintiffs' permit application, Defendants' responses detailing Plaintiffs' alleged deficiencies with respect to the permit application, and Plaintiffs' ongoing attempts to comply in completing the permit application. (*Id.*) The attachments do not include any documentation as to how Defendants reached their jurisdictional findings but are instead the photographs and charts, final forms, or documentation as to alleged failures on Plaintiffs' part in the application process. (*Id.*) The Court ultimately granted in part and denied in part *Plaintiffs' Motion for Contempt and Enforcement of Order* (Doc. 97), specifically holding Defendants in contempt "for the Government's unreasonable, unjustified, and unexplained delay in the permit process" and requiring Defendants to "supplement the administrative record with everything that transpires during the permit application process." (Doc. 110 at 1–2.) Furthermore, the Court had previously clearly ordered Defendants to include in the record "those materials dating back to the inception of this process." (Doc. 85 at 1.) The record filed by Defendants includes neither materials dating back to the inception nor supplementation. (Docs. 131-1–4, 139, 163, 177-2.) It likewise does not include the

supporting materials relied upon by the Corps in reaching the Preliminary and Approved Jurisdictional Determinations. (*See* Docs. 131-1–4, 139, 163, 177-2.)

Plaintiffs ultimately withdrew their permit application based on their understanding that it would require an admission that they were currently in violation of the Clean Water Act. (Doc. 143 at ¶6; *see* Doc. 171-1 at 6.) Plaintiffs instead sought to amend their complaint to challenge the 2021 Approved Jurisdictional Determination and to claim damages under the Federal Tort Claims Act ("FTCA"). (Doc. 143.) Defendants filed a partial motion to dismiss, (Doc. 160), which the Court granted in part and denied in part, (Doc. 175). The Court denied the motion with respect to Plaintiff's FTCA claims but dismissed without prejudice Plaintiffs' motion for damages under the Clean Water Act and Plaintiffs request under the APA for a stay of the EPA's actions on some of Lewis's non-Milton Lane property. (*Id.* at 47.)

Remaining at issue in this proceeding, then, is Plaintiffs' *Motion for Summary Judgment* to determine whether there is in fact Clean Water Act jurisdiction over Milton Lane—a question that requires the Court to review the Corps' agency determination of Clean Water Act jurisdiction. (Doc. 171-1 at 7.)

### 1.    *Parties' Statements of Facts*

The parties agree on few material facts in this matter. Plaintiffs assert that all relevant waters alleged to be "tributaries" are shared between the Milton Lane Property and the 40-acre property and that the route of flow is the same for these waters, (Doc. 171-2 at 1); Defendants dispute this, arguing that Switch Cane Bayou was not included in the 40-acre property Approved Jurisdictional Determination, (Doc. 177-1 at 1–2). Plaintiffs assert that Defendants' Cease and Desist Orders and the RV Park EPA enforcement extend beyond the Milton Lane Property, (Doc.

171-2 at 2); Defendants admit this but claim it has no impact on the *Motion for Partial Summary Judgment*, (Doc. 177-1 at 2).

Defendants also dispute the accuracy, materiality, or both of Plaintiffs' characterization of the Milton Lane waters, particularly in relation to the waters identified in the 40-acre Approved Jurisdictional Determination; Plaintiffs' description of the Milton Lane tract; Plaintiffs' characterization of a 2014 ELOS Environmental Study; Plaintiffs' description of the Corps' aerial imagery of the Milton Lane Property; and Plaintiffs' characterization of a 2016 "no-significant nexus" expert report for the Milton Lane Property. (Doc. 177-1 at 2–5.)

Plaintiffs dispute Defendants' characterization of Switch Cane Bayou and abutting wetlands as jurisdictional; Defendants' description of Switch Cane Bayou as outside of the area evaluated in the other 40-acre Approved Jurisdictional Determination; and the materiality of Defendants' note that the Fifth Circuit's opinion in *Lewis* does not mention Switch Cane Bayou, as well as their assertion that Switch Cane Bayou and the unnamed waterway discussed in *Lewis I* are distinct waters. (Doc. 180-1 at 5.)

### B. Legal Background

In addition to the factual background of the case at hand, the Court will address relevant developments in the case law governing Clean Water Act jurisdiction.

At the time this motion was first filed before the Court, the governing case law was *Rapanos v. United States*, 547 U.S. 715 (2006). At issue in *Rapanos* was whether the Corps had jurisdiction over wetlands at least eleven miles away from the nearest navigable water but which were "near ditches or man-made drains that eventually empty into traditionally navigable waters." *Rapanos*, 547 U.S. at 720, 729 (Scalia, J., plurality). A fractured Supreme Court released a plurality opinion authored by Justice Scalia, which stated that the statutory "phrase 'the waters of the United

States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes." *Id.* at 739 (citing Webster's Second 2882) (cleaned up). The plurality further clarified that "[t]he phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* As such, it would have held that the Corps' "expansive interpretation of [] 'the waters of the United States'"—which would include channels with intermittent or ephemeral flow—was "not 'based on a permissible construction of the statute.'" *Id.* (citing *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 (1984)).

The main dissent, on the other hand, authored by Justice Stevens, would have held that the Corps' "decision to treat" "wetlands adjacent to tributaries of traditionally navigable waters" "as encompassed within the term 'waters of the United States' is a quintessential example of the Executive's reasonable interpretation of a statutory provision." *Rapanos*, 547 U.S. at 788 (Stevens, J., dissenting). The dissent noted that "the dictionary treats 'streams' as 'waters' but has nothing to say about whether streams must contain water year round to qualify as 'streams.'" *Id.* at 801 (citing *Rapanos*, *ante*, at 732–34, and n.6 (citing Webster's New International Dictionary 2493 (2d ed. 1954) "as defining stream as a 'current or course of water or other fluid, flowing on the earth'")). The dissent argued that "common sense and common usage demonstrate that intermittent streams, like perennial streams, are still streams[,]" *id.*, and that Clean Water Act jurisdiction would therefore apply, *id.* at 804.

Given the lack of a majority opinion, Justice Kennedy's concurrence was adopted as the governing law in the wake of the *Rapanos* decision. Justice Kennedy relied upon *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159 (2001) (*SWANCC*), which held that "to constitute 'navigable waters' under the [Clean Water] Act, a water or wetland must possess 'a

significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Rapanos*, 547 U.S. at 759 (Kennedy, J., concurring) (citing *SWANCC*, 531 U.S. at 167). The concurrence held that the relevant test was not whether a water's flow was intermittent but whether it had a significant nexus to a traditionally navigable water. *Id.* at 771–72, 782.

In 2023, the Supreme Court issued a unanimous opinion in *Sackett v. EPA*. The Supreme Court "conclude[d] that the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water "forming geographic[al] features" that are described in ordinary parlance as "streams, oceans, rivers, and lakes."'" *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739 (quoting Webster's New International Dictionary 2882 (2d ed. 1954 (Webster's Second); original alterations omitted))). In doing so, it held that Clean Water Act jurisdiction over wetlands required a showing that the wetlands were adjacent to a body of water constituting "'waters of the United States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters)[.]" *Id.* at 676 (quoting *Rapanos*, 547 U.S. at 742). It rejected both the "significant nexus" test and the Corps' interpretation that allowed for Clean Water Act jurisdiction over "'any parcel of land containing a channel or conduit... through which rainwater or drainage may occasionally or intermittently flow[.]'" *Id.* at 706 (quoting *Rapanos*, 547 U.S. at 722).

In response to the Supreme Court's 2006 *Rapanos* decision, the Corps adopted multiple iterations of the Navigable Waters Protection Rule in an attempt to define "the waters of the United States," including traditional navigable waters, tributaries, lakes, and adjacent wetlands. Most relevant are the 2015 Rule, 80 FR 37054 (June 29, 2015); the 2020 Rule, 85 FR 22250 (April 21, 2020) which was in effect when the 2021 Approved Jurisdictional Determination was issued; and the 2023 Rule, 88 FR 3004 (January 16, 2023), which is now in effect. These iterations faced

various legal challenges. *See, e.g.*, *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015); *In re EPA & Dep't of Def. Final Rule*, 803 F. 3d 804 (6th Cir. 2015), *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109 (2018); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018); *Texas v. EPA*, No. 3:15-cv-162, 2018 U.S. Dist. LEXIS 160443, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) (all litigating the 2015 Rule). *See also State of Colorado v. EPA, et al.*, 989 F.3d 874 (2021) (litigating the 2019 Rule). *See also Texas v. United States EPA*, 662 F. Supp. 3d 739 (S.D. Tex. 2023); *West Virginia v. EPA*, No. 3:23-cv-32, 2023 U.S. Dist. LEXIS 64372, 2023 WL 2914389 (D.N.D. Apr. 12, 2023) (both enjoining the 2023 Rule, which has since been amended). In jurisdictions where the 2023 Rule has been enjoined, such as Louisiana, the Corps states that it is "implementing [its] pre-2015 definition of 'waters of the United States,' consistent with relevant case law and longstanding practice, as informed by applicable guidance, training, and experience (referred to as the 'Pre-2015 Regulatory Regime'), for both wetlands and non-wetlands waters, consistent with *Sackett* and the plurality opinion in *Rapanos v. United States*, 547 U.S. 715, 742 (2006) for wetlands." (Doc. 177 at 3–4 (citing 88 Fed. Reg. at 3006 n.6; EPA, *Pre-2015 Regulatory Regime*, Waters of the United States (last updated Mar. 18, 2024), https://www.epa.gov/wotus/pre-2015-regulatory-regime).)

Following *Sackett*, the relevant regulations were amended in order "to conform with *Sackett*." 88 FR 61964. The regulation now defines tributaries in paragraph (a)(3) as "[t]ributaries of waters identified in paragraph (a)(1) or (2) of this section that are relatively permanent, standing or continuously flowing bodies of water[.]" 33 CFR § 328.3(a)(3) (effective Sept. 8, 2023). The plain language of both *Sackett* and the regulation, then, requires that tributaries be "relatively permanent, standing or continuously flowing bodies of water[.]" *Sackett*, 598 U.S. at 671; 33 CFR § 328.3(a)(3). The *Rapanos* plurality, whose conclusions the *Sackett* Court adopted, "emphasize[d]

11

the requirement of *continuous* flow" in stating that "relatively continuous flow is a *necessary* condition for qualification as a 'water,' not an *adequate* condition." *Rapanos*, 547 U.S. at 733 n.6, 736 n.7.

Granted, the *Rapanos* plurality acknowledged that "[b]y describing 'waters' as 'relatively permanent,' we do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought." *Id.* at 732 n.5. Likewise, it did "not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months[,]" using the dissent's example of a "290-day, continuously flowing stream." *Id.* The plurality explicitly stated that while "channels containing permanent flow are plainly within the definition" of waters of the United States, "'intermittent' and 'ephemeral' streams . . . are not." *Id.*

## III. APPLICABLE LEGAL STANDARDS

### A. MSJ Standard

Ordinarily, motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

However, "the movant 'need not negate the elements of the nonmovant's case.'" *Id.* (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc))). That is, "[a] movant for summary

judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original)). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (*citing Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (cleaned up).

Additionally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (citing, *inter alia*, *Ragas*, 136 F.3d at 458). *See also Nissho—Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case

. . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered); *cf. U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion. Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor. Or, the non-moving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of [material] fact.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (cleaned up).

Of course, as Defendants note, this is not a typical summary judgment—instead, Plaintiffs seek summary judgment declaring "that there is no Clean Water Act ('CWA') jurisdiction over Plaintiffs' land because adjacent waters are not Relative Permanent Water ('RPW') and these 'lands' are distinguishable from distant 'waters of the United States'." (Doc. 171-1 at 4.) In other words, what Plaintiffs seek is the Court's review of the Corps' Approved Jurisdictional Determination.

### B.  APA Agency Review

As the Court has previously stated, the Clean Water Act does not set forth standards for reviewing the Corps' decisions. *Lewis v. United States*, No. 17-CV-1644, 2020 U.S. Dist. LEXIS

138540 at *27, 2020 WL 4495473 at *9 (M.D. La. Aug. 4, 2020). Instead, the Administrative Procedure Act provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The APA states that a reviewing court shall set aside agency findings, conclusions, and actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that fail to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2). The Supreme Court has recently clarified that "courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (quoting § 706). It further clarified that while "judicial review of agency policymaking and factfinding" is deferential, the APA "prescribes no deferential standard for courts to employ in answering [] legal questions." *Id.* (citing § 706(2)). "[A]gency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.*

The APA provides that in determining whether an agency action, finding, or conclusion was unlawful, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

## IV. ANALYSIS

Here, the Corps issued an Approved Jurisdictional Determination on January 19, 2021, stating its decision that the property contains "waters of the United States." (Doc. 100-3 at 55.) As a preliminary matter, the Approved Jurisdictional Determination is a final agency action which Plaintiff may challenge. *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 595 (2016).

**A. Administrative Record**

First, with respect to the Court's review of the agency's findings, conclusions, and actions, the APA provides that the Court shall rely upon the Administrative Record. 5 U.S.C. § 706. Here, however, Defendants have repeatedly failed to produce the whole record as required by the Court. (Docs. 85, 99, 110.) This specific motion is on the agency's Approved Jurisdictional Determination of January 19, 2021, finding that Switch Cane Bayou is a tributary allowing for Clean Water Act jurisdiction over the Milton Lane Property. (Doc. 171-1 at 7.) In an ideal world, the Court's review of this Approved Jurisdictional Determination would rely upon the Administrative Record, including—as the Court previously required Defendants to file—"those materials dating back to the inception of this process." (Doc. 85 at 2; *see* Doc. 99.) The Court does not have the whole Administrative Record. It has many exhibits filed by Plaintiff and a limited record filed by Defendants as attachments to *United States' Opposition to Motion for Order of Contempt* (Doc. 100-1–12.) To be clear, Defendants do not claim that these attachments are the administrative record. (*See* Doc. 100.) However, at no point have Defendants filed any other set of documents with the Court that might be considered the complete administrative record, nor even an abbreviated administrative record. Instead, Plaintiffs allege, Defendants delivered to Plaintiffs approximately 70,000 pages of discovery materials, only some of which were pertinent to the Milton Lane Property. (Doc. 141 at 3.)

Furthermore, following Plaintiffs' withdrawal of their permit request, Defendants argued that they could not complete an administrative record until the Plaintiffs submitted a permit application, and they requested an indefinite extension to submit the administrative record. (Doc. 131 at 3 n.2.) Defendants filed a *Notice of Filing of Certification of Supplementation of the Administrative Record* (Doc. 139), informing the Court that it had conducted a search for any

documents produced during the permit application process and was "producing the non-privileged documents that meet the description." (Doc. 139-1.) No further attachments were filed with this *Notice*.

The Court, then, must base its review of the agency's Approved Jurisdictional Determination on the administrative record as filed with the Court: the attachments filed to *United States' Opposition to Motion for Order of Contempt* and the documents Plaintiffs have filed from the 70,000 pages of discovery materials. The Court will not look at documents produced after January 19, 2021, the date the Milton Lane Approved Jurisdictional Determination was produced.

## B. Statutory Interpretation

Given the Supreme Court's recent decision in *Loper Bright*, the Fifth Circuit has reiterated that "[i]n conducting review of an agency's action under the APA, the 'court shall decide all relevant questions of law' and 'interpret . . . statutory provisions.'" *Rest. L. Ctr. v. United States DOL*, 120 F.4th 163, 170 (5th Cir. 2024) (citing § 706). In *Restaurant Law Center*, the Fifth Circuit refused to apply an agency rule "in a manner inconsistent with the [statute's] text[,]" emphasizing that it is "guided instead by the 'core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.'" *Id.* at 174–75 (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Where the rule was inconsistent with the text, the Fifth Circuit found that it violated the APA because it was "'not in accordance with law.'" *Id.* at 175 (citing 5 U.S.C. § 706(2)(A)). While the Fifth Circuit then proceeded to analyze whether the rule at issue in *Restaurant Law Center* was arbitrary and capricious, *id.*, neither party in the instant case has argued that the agency decision here is arbitrary and capricious. The Court will therefore limit its analysis to whether or not the agency's action is consistent with the statutory text and therefore in accordance with the law, as required by the APA.

The Court will begin by addressing the statutory interpretation question of whether the Corps' definition of "tributaries" aligns with *Sackett* and the relevant regulations.

In the Approved Jurisdictional Determination, the Corps found that there were "waters of the United States" as defined by the Clean Water Act at the time the Approved Jurisdictional Determination was issued. (Doc. 171-29 at 13.) It based this finding on the presence of two "tributaries ((a)(2) waters)" which it determined met the criteria of "(a)(2) [i]ntermittent tributar[ies] contribut[ing] surface water flow directly or indirectly to an (a)(1) water in a typical year." (*Id.* at 13–14.) At the time, the relevant regulations defined (a)(1) waters as "territorial seas, and waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide[.]" 33 CFR § 328.3(a)(1) (effective June 22, 2020). The same regulation defined (a)(2) waters simply as "[t]ributaries," which at the time "mean[t] a river, stream, or similar naturally occurring surface water channel that contributes surface water flow to a water identified in paragraph (a)(1) of this section in a typical year either directly" or through other jurisdictional waters of the United States. 33 CFR § 328.3(c)(12) (effective June 22, 2020). It further stated that "[a] tributary must be perennial or intermittent in a typical year," defining intermittent as meaning "surface water flowing continuously during certain times of the year and more than in direct response to precipitation."    33  CFR  §  328.3(c)(6),  (c)(12)  (effective  June  22,  2020).  The  Approved Jurisdictional Determination cited to the 2020 Navigable Waters Protection Rule ("NWPR"), which explained the government's reliance upon the "significant nexus" test as described in Justice Kennedy's concurrence in *Rapanos v. United States*. 85 FR 22250 (citing 547 U.S. 715, [] () (Kennedy, J., concurring)). The Rule explained that agencies had relied upon "Justice Kennedy's reasoning more broadly to include, for example, the application of the significant nexus test to

determining jurisdiction over tributaries, not just wetlands." 85 FR at *22267. The Rule noted that Justice Kennedy's concurrence did not require a hydrologic connection. *Id* at 22268.

As explained above, on May 25, 2023, the Supreme Court decided *Sackett v. EPA*, which "conclude[d] that the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water 'forming geographical features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett*, 598 U.S. at 671 (citing *Rapanos*, 547 U.S. at 739). The relevant regulations were amended in order "to conform with *Sackett*." 88 FR 61964–65. It now defines tributaries in paragraph (a)(3) as "[t]ributaries of waters identified in paragraph (a)(1) or (2) of this section that are relatively permanent, standing or continuously flowing bodies of water[.]" 33 CFR § 328.3(a)(3) (effective Sept. 8, 2023).

The plain language of both *Sackett* and the regulation, then, requires that tributaries be "relatively permanent, standing or continuously flowing bodies of water[.]" *Sackett*, 598 U.S. at 671; 33 CFR § 328.3(a)(3). The *Rapanos* plurality, whose conclusions the *Sackett* Court adopted, "emphasize[d] the requirement of *continuous* flow" in stating that "relatively continuous flow is a *necessary* condition for qualification as a 'water,' not an *adequate* condition." *Rapanos*, 547 U.S. at 733 n.6, 736 n.7. Granted, the *Rapanos* plurality acknowledged that "[b]y describing 'waters' as 'relatively permanent,'" it did "not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought." *Id.* at 732 n.5. Likewise, it did "not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months[,]" using the dissent's example of a "290-day, continuously flowing stream." *Id.* The plurality explicitly stated that while "channels containing permanent

flow are plainly within the definition" of waters of the United States, "'intermittent' and 'ephemeral' streams . . . are not." *Id.*

Although the Court employs a deferential standard of review of agency policymaking and factfinding, it does not do so with respect to agency interpretations of statute. In reviewing the Corps' determination, the Court will use the legal standard set forth by *Sackett*, guided by the *Rapanos* plurality: a tributary must be "relatively permanent, standing or continuously flowing" rather than intermittent or ephemeral.

The Corps interprets *Rapanos* as defining "a 'relatively permanent' (and therefore potentially jurisdictional) waterbody [as] one with flowing water 'at least seasonally (e.g., typically three months)' that is not solely in response to precipitation." (Doc. 177 at 10) (citing U.S. EPA & U.S. Army Corps of Engineers, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 02, 2008) at 6–7 ("*Rapanos Guidance*")). However, Defendants omit an important element of the *Rapanos Guidance*. In the cited portion, the agency advised—in keeping with *Rapanos* and later *Sackett*—that "'relatively permanent' waters do not include ephemeral tributaries which flow only in response to precipitation" and, crucially, "intermittent streams which do not typically flow year-round or have *continuous* flow at least seasonally." *Rapanos Guidance* at 7. At no point in the Approved Jurisdictional Determination, (Doc. 171-29), or in *Defs. Opposition*, (Doc. 177), do Defendants allege that Switch Cane Bayou flows either year-round or continuously during a three-month period. Instead, in the Approved Jurisdictional Determination, the Corps identifies Switch Cane Bayou as an intermittent tributary, with "intermittent flow in a typical year." (Doc. 171-29 at 13.) The Corps stated that "Switchcane [sic] Bayou was observed on multiple site visits to have intermittent flow." (Doc. 171-29 at 17.)

The Court treats the Corps' factfinding and its determinations with deference. Here, the Corps found Switch Cane Bayou to have intermittent flow and to be subject to Clean Water Act jurisdiction. (Doc. 171-29.) These cannot both hold true under *Sackett*. The Corps argues that it might be able to find facts to support a more-than-intermittent flow. (Doc. 177 at 9.) However, those facts are not in the record before the Court at present. The Corps has not provided the Court with the data sources upon which it relied in reaching the conclusions of the Approved Jurisdictional Determination. As part of the Approved Jurisdictional Determination, the Corps lists "all resources that were used to aid in this determination" and is instructed to "attach data/maps to this document and/or references/citations in the administrative record, as appropriate." (Doc. 100-3 at 57.) It lists information submitted by Plaintiffs, "[d]ata sheets prepared by the Corps", "[a]erials and other site photos", site visits, previous Approved and Preliminary Jurisdictional Determinations, a precipitation tool, a soil survey, a "NWI Mapper", "USGS topographic maps" dating back to 1934, as well as multiple other USGS maps and precipitation data sources during site visits. (Doc. 100-3 at 57–58.) Defendants have filed only small portions of this material with the Court. The Court is therefore unable to rely on any of the unsubmitted factfinding from the Corps in its review of the Approved Jurisdictional Determination.

However, Plaintiffs have filed relevant materials from the 70,000 pages of discovery Defendants provided. First, Plaintiffs have provided Defendants' memorandum for the record of their site visits. (Doc. 107-7.) In this memorandum, Defendants' employee Brad Guarisco describes his visits to the Milton Lane property. (*Id.*) He mentions Switch Cane Bayou on November 4, 2020, when he does not note whether any water or flow was observed; on November 18, 2020, on which he does note "discernable flow"; and on December 14, 2020, when Guarisco noted "Switchcane [sic] Bayou flowing with even greater flow than what was previously

observed." (Doc. 107-7 at 2, 5, 6.) Guarisco's memorandum, then, notes only two instances of flow nearly four weeks apart in Switch Cane Bayou during his site visits from October 21, 2020, through December 17, 2020. (*Id.* at 2–6) This can scarcely be described as "continuous" or "relatively continuous" flow. Defendants have filed nothing to demonstrate more continuous flow.

The Court is further in possession of the Approved Jurisdictional Determination itself, which states that "Switchcane [sic] Bayou was observed on multiple site visits to have intermittent flow. Switchcane [sic] Bayou is intermittent north, within, and south of the review area as informed by multiple site visits and topographic maps from 1934 to present day." (Doc. 100-3 at 59.) The Approved Jurisdictional Determination also states that the "observed and documented flow in both Switchcane [sic] Bayou and the Unnamed tributary were flowing within a typical year, and not because of extreme precipitation." (*Id.* at 58.) At no point does the Approved Jurisdictional Determination indicate that Switch Cane Bayou has continuous flow, even seasonally.

However, in *Defs. Opposition*, Defendants argue that "Switchcane [sic] Bayou [] may be a relatively permanent tributary[.]" (Doc. 177 at 9.) They point to the language of the *Rapanos* plurality acknowledging that waters that "might dry up in extraordinary circumstances, such as drought" are "not necessarily exclude[d]" from waters of the United States. (*Id.* at 10) (quoting *Rapanos*, 547 U.S. at 732 n.5). Defendants omit entirely the *Rapanos* language stating that while "channels containing permanent flow are plainly within the definition" of waters of the United States, "'intermittent' and 'ephemeral' streams . . . are not." *Rapanos*, 547 U.S. at 732 n.5. Instead, they argue, "if the Corps were to reconsider the Milton Lane AJD on remand, the determination that Switchcane [sic] Bayou is 'at least intermittent' might support a determination that Switchcane [sic] Bayou is seasonal and, therefore, relatively permanent." (Doc. 177 at 11) (citing *Rapanos*, 547 U.S. at 736 n.7).

The Court is deferential in its review of agency factfinding. At issue here, though, is not the agency's factfinding but whether the agency's determination, based on its interpretation of the facts, is in accordance with the law. Upon the facts before it, only some of which the Court possesses, the Corps found that Switch Cane Bayou had an intermittent flow. (Doc. 100-3.) In accordance with the regulations in effect at the time, the Corps could assert jurisdiction not only over those tributaries that were "relatively permanent, standing or continuously flowing bodies of water" but also over "not relatively permanent tributaries and their adjacent wetlands where such tributaries and wetlands have a significant nexus to a traditional navigable water." 33 CFR 328.3(a)(3); *Rapanos Guidance* at 8. It did so, without needing to find that Switch Cane Bayou had a continuous flow. Now that *Sackett* has overturned the "significant nexus" test, a tributary must be relatively permanent to be a water of the United States. *Sackett*, 598 U.S. at 678–79; 328 CFR 328(a)(3). Defendants have had multiple opportunities to provide the Court with additional factual findings—from the 70,000 pages of discovery materials provided to Plaintiffs, for example—to support their assertion that Switch Cane Bayou may in fact have continuous flow. But the Corps does not argue that its previous factfinding supports such a conclusion. Instead, it implies that if it were permitted to go back and redo its factfinding with this new test in mind, it could feasibly come to a conclusion tailored to the new test rather than the old one. (Doc. 177 at 11.) Despite its own repeated pattern of failing to file the Administrative Record with the Court, Defendants argue that they should be allowed another bite at the apple due to the current "insufficient record support to allow the Court to make a *de novo* finding of no jurisdiction." (*Id.*)

This Motion was filed nearly a decade after Plaintiffs first requested a jurisdictional determination as to Milton Lane in 2014. (Doc. 23 at 5; Doc. 171.) The Corps did not provide the requested Approved Jurisdictional Determination until January 19, 2021. (Doc. 100-3.) The Corps

had over six years to review the property—and nearly a year to do so after this Court ordered it to complete the Approved Jurisdictional Determination. (*See* Doc. 67 at 26.) At no point over the past decade has the Corps claimed that Switch Cane Bayou is continuously flowing. It has asserted such a claim only after the legal requirements for a tributary to be considered jurisdictional waters of the United States have been clarified by the Supreme Court. (Doc. 177 at 11.)

While the Court continues to treat an agency's factfinding with deference, an agency may not simply change its findings of fact to meet the agency's preferred outcome in a case. The Corps found that Switch Cane Bayou is an intermittent tributary. At the time, the agency's interpretation of the statute may have allowed for a finding of Clean Water Act jurisdiction based on these facts. Today, post-*Sackett*, the agency's facts do not support a finding of Clean Water Act jurisdiction. The Approved Jurisdictional Determination is inconsistent with 33 CFR § 328.3(a)(3) and with *Sackett*. Its determination is unsupported by the evidence presented by the Approved Jurisdictional Determination and the record taken as a whole. As such, the Approved Jurisdictional Determination is not in accordance with the law and is in violation of the APA.

### C. Remand

As the Supreme Court has stated, "[i]t is a well-established maxim of administrative law that 'if the record before the agency does not support the agency action, or if the agency has not considered all relevant factors, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Calcutt v. FDIC*, 598 U.S. 623, 628–29 (2023) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)) (cleaned up). However, the Supreme Court also noted that "remand may be unwarranted in cases where 'there is not the slightest legal uncertainty as to the outcome' of the agency's proceedings on remand." *Id.* (quoting *NLRB v. Wyman-Gordon Co.*, 294 U.S. 759, 767 n.6 (1969)).

In *Lewis v. United States*, involving these same litigants on appeal from the Eastern District of Louisiana, the Fifth Circuit declined to remand to the Corps for further proceedings. 88 F.4th at 1079. Instead, the Fifth Circuit held that "[w]here the governing law is now clear, and the relevant facts cannot be disputed, the only possible conclusion" was a finding that the wetlands at issue were not adjacent to a Clean Water Act jurisdictional water. *Lewis I*, 88 F.4th at 1079–80. The Fifth Circuit remanded to the Eastern District "with instructions to enter judgment in favor of Lewis that the tracts in question are not 'waters of the United States' under *Sackett*." *Id.* at 1080.

Here, the law has likewise been settled by *Sackett*. The Corps does not dispute the facts as stated in the Approved Jurisdictional Determination—that Switch Cane Bayou is "intermittent." Documents produced by the agency prior to the Approved Jurisdictional Determination likewise state that Switch Cane Bayou had an intermittent but not seasonal flow on Plaintiff's property. Defendants instead argue that on remand, the Corps might find new facts, allowing for a finding that the intermittent flow is in fact seasonal. The standard set forth by *Calcutt*, though, is not that a remand is proper where an agency could find entirely new facts that could support its desired conclusion. Instead, *Calcutt* states that a remand is proper "if the record before the agency does not support the agency action, or if the agency has not considered all relevant factors." *Calcutt*, 598 U.S. at 628–29.

The Court does not possess the complete record that was before the agency when it made its determination. However, on the record submitted to the Court and deferring to the agency's findings of facts, the Court still cannot accept the agency's interpretation of the law. Furthermore, the Court is unaware of any court since *Sackett* that has held that a tributary with only an intermittent flow that is not continuous for at least some months of the year may be a relatively permanent water. *See, e.g.*, *Ragsdale v. JLM Constr. Servs., Inc.*, 737 F. Supp. 3d 449, 464–65

(W.D. Tex. 2024); *United States v. Sharfi*, No. 21-14205, 2024 U.S. Dist. LEXIS 171175 at \*36, 2024 WL 4483354 at \*13–14 (S.D. Fla. Sep. 21, 2024) (magistrate report and recommendation that the district court not find Clean Water Act jurisdiction where the tributaries at issue were at most intermittent or ephemeral rather than continuous); *c.f. Baykeeper v. City of Sunnyvale*, No. 5:20-824, 2023 U.S. Dist. LEXIS 220102 at \*11–12, 2024 WL 8587610 at \*5 (N.D. Ca. Dec. 11, 2023) (finding that tributaries were "relatively permanent" where they had a seasonally continuous flow).

The Corps may believe that the Clean Water Act, the relevant regulations, and *Sackett* all permit them to exercise jurisdiction where there is a tributary that has repeatedly been found to be a non-Relatively Permanent Water, has never been found to have a continuous flow on Lewis Plaintiffs' land, and has repeatedly been found to have intermittent flow. However, the law is clear. For a tributary to be a water of the United States, it must be "relatively permanent, standing or continuously flowing[.]" 33 CFR 328.3. The Corps' attempted interpretation, that an intermittent flow—even one that is both seasonal and intermittent—suffices for Clean Water Act jurisdiction, is not consistent with the statute. While the Court defers to the Corps with respect to factfinding and policymaking, it does not defer with respect to statutory questions.

With respect to remand, then, the governing law is clear and the facts are not disputed. The Court finds that Switch Cane Bayou is not a tributary of the United States on the Milton Lane Property. *Plaintiffs' Motion for Partial Summary Judgment*, (Doc. 171), is granted with respect to Plaintiffs' request for the Court's review of the Approved Jurisdictional Determination.

## V. Fees

Finally, Plaintiffs' request for attorneys' fees and costs under the Equal Access to Justice Act (EAJA) is not yet ripe. Plaintiffs continue to pursue additional claims under the FTCA. (Doc.

175.) As Defendants argue, attorneys' fees and costs under the EAJA require a "final judgment" which means "a judgment that is final and not appealable[.]" 28 U.S.C. § 2412(G). This ruling grants only partial summary judgment and as such is not a final judgment. Plaintiffs' motion for fees is denied, without prejudice as to refiling upon a final judgment.

## VI. CONCLUSION

Accordingly, *Plaintiffs' Motion for Partial Summary Judgment and Fees*, (Doc. 171), brought by Garry Lewis, Brenda Gayle Lewis, G. Lewis Louisiana, LLC, Robert Beard, Carolyn Milton, and Town of Livingston, LA, is GRANTED IN PART and DENIED IN PART. Plaintiffs' motion for partial summary judgment is GRANTED; Defendant United States Army Corps of Engineers' determination of Clean Water Act jurisdiction over the Milton Lane Bayou is not in accordance with current law. However, Plaintiffs' motion for attorneys' fees and costs is DENIED; this motion is not yet ripe since there has not yet been a final judgment in this matter.

Signed in Baton Rouge, Louisiana, on <u>January 29, 2025</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**